IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SHARON A. ANTHONY            )
                             )
v.                           )        No. 3:08-0328
                             )        Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided under Titles II and XVI of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 14), to which defendant has responded (Docket Entry No. 20). Plaintiff has further filed a reply brief in support of her motion (Docket Entry No. 21). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings, to include rehearing.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

# I. Introduction

Plaintiff filed her DIB and SSI applications on September 10, 2004, alleging the onset of disability as of June 25, 2004, due to peripheral neuropathy, fibromyalgia, and depression (Tr. 75, 79). These applications were denied at the state agency level of adjudication (Tr. 38-43), whereupon plaintiff submitted her request for hearing before an Administrative Law Judge ("ALJ") (Tr. 36). A hearing was held on May 8, 2007, when plaintiff appeared with counsel and gave testimony. (Tr. 416-35) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement, until June 22, 2007, when she issued a written decision denying plaintiff's claims to benefits. (Tr. 16-25) The decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since June 25, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: peripheral neuropathy, fibromyalgia, obesity, depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday, with the postural limitations of: occasional

2

climbing ramps and stairs, climbing ladders, ropes and scaffolds, balancing, stooping, kneeling, crouching, and crawling, with the mental restrictions of having some difficulty, but still be able to: remember and carry out detailed instructions, maintain prolonged concentration, and perform unskilled work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 2, 1956, and currently is 51 years old, which is defined as an individual "closely approaching advanced age," on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has an unlimited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 25, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18, 19, 24, 25)

On January 18, 2008, the SSA's Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 4-6), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

Born January 2, 1956, plaintiff was fifty-one years old at the time of her hearing before the ALJ (Tr. 419). She completed eleven and one-half years of formal schooling, but did not graduate high school. Nevertheless, she was able to obtain certification as a nursing assistant, and is not considered to have a limited education. Plaintiff has more than twenty years of experience as an assistant in the field of nursing/caretaking. (Tr. 86, 114) She reported being divorced, with two adult children. (Tr. 114). Plaintiff resided in Lansing, Michigan at the time of the alleged onset of disability and beyond, until moving to middle Tennessee in August 2006.

Plaintiff was treated at the Michigan State University ("MSU") Clinical Center, in East Lansing, Michigan, from February 2004 until June 2006. On June 29, 2004, she presented to the clinic complaining of pain and swelling in her legs, which had been occurring on and off for the prior three months. (Tr. 208) After a venous doppler test and laboratory analysis returned normal results, plaintiff was treated with samples of the nonsteroidal anti-inflammatory Celebrex. (Tr. 210) Plaintiff continued to complain of bilateral foot pain in July 2004 (Tr. 194, 199, 201), as well as lower back pain radiating into the hips (Tr. 193). In August 2004, plaintiff was seen in followup for her leg pain, and was newly diagnosed with sleep deprivation and adjustment disorder with mixed features (Tr. 188-90). She was referred to neurology for evaluation of possible neurogenic pain, and the possibility of fibromyalgia was discussed (Tr. 190).

On August 10, 2004, plaintiff was seen in the MSU neurology clinic, and was diagnosed with peripheral neuropathy and prescribed Neurontin for treatment of her leg symptoms. (Tr. 182-86) The attending neurologist gave the following summary of plaintiff's

4

condition:

> This 48 year-old female has evidence of a small greater than large fiber, painful peripheral neuropathy with marked hyperpathia.  Also of note is that she reports weight gain of ~100 pounds in the past 12 months.  She has no other significant past medical history.  Her family history is significant for some collagen vascular disease and fibromyalgia.  Tests to date have included normal values for TSH, CBC, basic comp panel, ESR, and B12.  Though her sleep has improved on elavil, she has had little pain relief....

(Tr. 186)  Electrodiagnostic testing, including electromyography and nerve conduction studies, returned normal results (Tr. 170-72).  Subsequent electroencephalography testing was negative for large fiber disease in the lower legs.  (Tr. 159)

In followup with the MSU nursing clinic in September 2004, plaintiff reported crying frequently, and Prozac was added as a new medication.  (Tr. 162-65)

On December 3, 2004, plaintiff presented for a consultative psychological examination at government expense, conducted by licensed psychologist Steve Geiger, Ph.D. (Tr. 113-16)  Dr. Geiger opined that plaintiff was "a troubled woman" who would benefit from continued counseling and a psychiatric consultation (Tr. 116).  He diagnosed plaintiff with major depression (recurrent, moderate) and panic disorder without agoraphobia.  Id. Dr. Geiger further opined that plaintiff's prognosis was "fair," and that her score on the global assessment of functioning scale was currently a 53, and at best within the past year, a 57.  Id.

On December 20, 2004, plaintiff was seen in consultation by Dr. Elaine Kountanis, a neurologist (Tr. 117-19).  Dr. Kountanis reported that plaintiff's pain and obesity were the factors limiting her orthopedic maneuvers, and that she was able to execute all such maneuvers in the examination room without assistance, "but she did them slowly

5

and with great effort." (Tr. 119) She further noted that plaintiff's chronic pain syndrome (fibromyalgia) appeared to be a valid profile, and that her profile was also consistent with small fiber peripheral neuropathy. Id.

On December 24, 2004, Dr. Leonard Balunas, Ph.D., a licensed psychologist hired by the state agency as a nonexamining consultant, opined that plaintiff was moderately limited by her symptoms of depression and anxiety in terms of her ability to remember and carry out detailed instructions and maintain prolonged concentration, but that she was nonetheless able to meet the demands of unskilled work. (Tr. 122-40)

On January 7, 2005, a nonexamining consultant employed by the state agency, Dr. Sadia Shaikh, M.D., reviewed plaintiff's file and made repeated note of plaintiff's significant foot pain with weight bearing (Tr. 143, 146, 148); nonetheless, Dr. Shaikh opined that plaintiff's peripheral neuropathy and fibromyalgia did not preclude the performance of light work duties, including standing or walking about 6 out of 8 hours. (Tr. 142)

On June 2, 2005, plaintiff was seen by Dr. Doublas H. Ruben, Ph.D., for a consultative psychological evaluation. (Tr. 379-83) This comprehensive report by Dr. Ruben begins by noting the reason for referral: "Evaluate malingering, rule out psychiatric disability and determine eligibility [for Social Security benefits]" (Tr. 379). After administration of a battery of psychological tests, Dr. Ruben concluded that plaintiff was not malingering, that her physical problems exacerbated her mental problems, and that she was disabled under the Social Security Act. (Tr. 381-83)

By letter dated December 27, 2005, Dr. LaClaire Bouknight, M.D., the internist who supervised plaintiff's care at the MSU nursing clinic, offered the following assessment in support of plaintiff's request for county disability benefits:

> Ms. Anthony is a patient here at the MSU Nursing Clinic. As the collaborating physician, I am well aware of her health issues as I have supervised her care. She is requesting to go on disability and I fully support her in this endeavor. She has seen numerous consultants (including neurologists), undergone a myriad of examinations, and tried many treatments with little improvement. She does have fibromyalgia to such a degree that she is unable to continue with her ususal employment or any other employment despite our best treatments. As you may know that although this disease is not life-threatening it is sometimes very difficult to treat or even control. Ms. Anthony has cooperated with all our treatments and is plainly unable to work.

(Tr. 151)

After moving to Tennessee in August 2006, plaintiff fell in a McDonald's restaurant and sustained a broken elbow, which was treated by Vanderbilt University Emergency Services staff and, in followup, by staff at Vine Hill Community Clinic. (Tr. 214-18) Plaintiff was referred by Vine Hill to Nashville General Hospital at Meharry for further evaluation of her injuries (Tr. 231). The staff at Nashville General diagnosed a fractured left elbow and sprain of the back and neck (Tr. 232), and applied a splint to the elbow, which was removed five days later (Tr. 229). By mid-October 2006, plaintiff's elbow was noted to be "relatively painless and fully functional." (Tr. 351)

On September 14, 2006, plaintiff was seen for the first time by Dr. Paul Talley in the Nashville General Department of Internal Medicine (Tr. 226). Dr. Talley diagnosed fibromyalgia and ordered return to care in 2-3 weeks. Id. Dr. Talley continued to treat plaintiff's fibromyalgia, as well as her symptoms of depression and anxiety, in the months that followed, referring her to physical therapy first in October 2006 and again in early 2007 to combat her consistent pain complaints (Tr. 337-44). After her first stint in physical therapy, plaintiff was discharged on November 10, 2006, with goals reportedly met, though

7

plaintiff's pain persisted at levels that were only lowered during therapy (Tr. 364). By February 2007, the medication regimen prescribed by Dr. Talley included Elavil, Prozac, ibuprofen, Nexium, Valium, Bentyl, and colchicine (Tr. 341, 343). Her second stint in physical therapy ended on April 25, 2007, with goals again reportedly met, though plaintiff's pain level was noted to fluctuate. (Tr. 400)

On March 8, 2007, plaintiff suffered a syncopal episode, passing out after returning from a trip to the grocery store. Plaintiff was hospitalized for further evaluation. It was ultimately determined that this syncopal episode did not represent any seizure activity (Tr. 261-62), and plaintiff was discharged home (Tr. 249-51). However, plaintiff was noted by a consulting physician to display a flattened affect and generalized malaise, and to appear severely depressed. (Tr. 261-62)

On April 26, 2007, Dr. Talley submitted assessments reflecting totally disabling restrictions on both physical and mental ability to perform work-related activities (Tr. 366-76). In particular, Dr. Talley opined that plaintiff could occasionally lift 10 pounds, stand or walk for 1 hour out of an 8-hour workday, and sit for 2 hours out of an 8-hour workday, with no squatting, crawling or climbing, occasional bending and reaching, and limited exposure to unprotected heights, moving machinery, operating equipment, dust, fumes, gases, excessive noise, or vibration. He opined that plaintiff's condition would be expected to produce severe pain and fatigue, and that it would frequently interfere with her concentration, require her to lie down for 4 out of 8 hours, and require 4 additional work breaks for 30 minutes at a time. He further opined that plaintiff was incapable of even low stress jobs, and that she would be expected to miss 15 workdays per month. With regard to plaintiff's mental limitations, Dr. Talley opined that she was markedly impaired in her ability

8

to understand, remember, and carry out complex instructions; in her ability to make judgments on complex work-related issues; in her ability to interact with the public and with coworkers; and, in her ability to respond to changes in a routine work setting. Dr. Talley opined that plaintiff would have extreme limitations in her ability to interact appropriately with supervisors.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be

used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff alleges that the ALJ erred in discounting the opinion of her treating physician, Dr. Talley, and that the ALJ otherwise erred in failing to appreciate and account for the rather unique nature of fibromyalia, particularly when determining the credibility of plaintiff's subjective pain complaints. Citing Rogers v. Comm'r of Soc. Sec., 486 F.3d 234 (6th Cir. 2007). As further explained below, the undersigned agrees that the ALJ erroneously regarded the record of treatment for plaintiff's fibromyalgia and small fiber peripheral neuropathy, and that defendant's decision must therefore be reversed.

To begin with, the parameters for weighing medical opinion evidence in DIB claims are provided in § 404.1527 of defendant's regulations, and in that section's

11

counterpart for SSI claims, § 416.927. When the opinion of the claimant's treating provider meets significant opposition in the record, and a decision must be made as to which opinion(s) most accurately describes the claimant's condition, the regulations establish a general preference for examining source opinions over the opinions of nonexamining sources, and among examining sources, for those who have a treatment relationship with the claimant over those who do not. 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Furthermore, the regulations generally require that more weight be given the opinion of a specialist about issues within his or her specialty than to the opinion of a generalist. Id. at §§ 404.1527(d)(5), 416.927(d)(5). Aside from these issues relating to the status of the medical source, the regulations prefer those opinions that are the better explained and better supported by medical signs and laboratory findings, as well as those that are consistent with the record as a whole. Id. at §§ 404.1527(d)(3)-(4), 416.927(d)(3)-(4).

Importantly, the Sixth Circuit has noted that "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." Rogers, 486 F.3d at 242. Accordingly, whenever the weight of a treating source opinion is discounted, claimants are assured that they will be provided with "good reasons" for the weight given their doctor's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The regulatory requirement of good reason-giving has been described by the Sixth Circuit as an "important procedural safeguard" which the agency cannot disregard in an *ad hoc* fashion. Bowen v. Comm'r of Soc. Sec., 478 F.3d 742, 747 (6th Cir. 2007)(quoting Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004)).

As defendant notes, Dr. Talley's submission to the agency in support of plaintiff's claim is comprised of three separate evaluation forms: a medical source statement of mental ability to do work-related activities (Tr. 366-68), a medical source statement of physical ability to do work-related activities (Tr. 369-73, 376), and a "statement of treating professional" (Tr. 374-75). Each of these assessments reflects totally disabling limitations.

As to the assessed limitations on plaintiff's mental ability to perform work-related activities, the only supporting factors identified by Dr. Talley are plaintiff's "constant pain," "fatigue," and "irritability." (Tr. 366-67) While there is certainly a degree of overlap between plaintiff's physical and emotional problems, this identification by Dr. Talley of what are largely products of plaintiff's physical impairments as cause for her mental limitations serves to underscore the fact that Dr. Talley is a physician, not a psychiatrist. As noted by the ALJ, Dr. Talley is not a "mental specialist," but is merely plaintiff's primary caregiver, who prescribed medications for her symptoms of depression and anxiety without referring her to further psychiatric care. (Tr. 23) Though the undersigned has some concerns about the ALJ's ultimate conclusion with respect to plaintiff's mental functioning, it appears that her reasoning with respect to Dr. Talley's assessment is supported by substantial evidence.[2]

---

[2]In particular, aside from Dr. Talley's lack of expertise in psychiatric healthcare, the ALJ reasoned that his assessment was overly restrictive and unsupported by the record "[c]onsidering the claimant, during the alleged period of disability ... has not require[d] treatment other than some medications from her primary caregiver, has continued to have extensive daily activities, and was assessed as having a global assessment of functioning of 61 and 53, suggesting mild to moderate mental impairments." (Tr. 23) Of concern, the "extensive" daily activities referenced by the ALJ are simply not that extensive or arduous. Moreover, the ALJ failed to note that the examining consultants who *were* experts in mental health and who assigned the global assessment of functioning scores relied upon by the ALJ -- Drs. Geiger and Ruben -- also opined, respectively, that plaintiff "appears to be a troubled woman" who would benefit from psychiatric care and who had only a fair prognosis (Tr. 116), and that her depression was disabling under the Social Security Act (Tr. 383),

As to Dr. Talley's assessments of plaintiff's physical capabilities, plaintiff's arguments regarding their rejection intertwine with her argument that the ALJ failed to appreciate the nature of fibromyalgia and its treatment. One target of these arguments is a recurring theme of the ALJ's decision, offered therein as support for both the rejection of Dr. Talley's assessments and for the credibility finding adverse to plaintiff: the treatment of plaintiff's pain complaints with only a prescription for ibuprofen, a nonsteroidal anti-inflammatory drug ("NSAID"). See Tr. 20 (referring to "relatively mild" pain medication), 21 (medication noted not to suggest "a high degree of pain"), 22 (rejecting opinions of Dr. Bouknight and Talley based in part on prescription of "only 600 mg. Ibuprofen for pain"). Plaintiff contends that "it is just as reasonable to account for the treating physician's prescription of Ibuprofen on other grounds without postulating that he did not really believe that the Plaintiff was experiencing 'a high degree of pain' [:] ... Dr. Talley was employed at a publicly funded hospital for the poor, Nashville General, and the Plaintiff was uninsured." (Docket Entry No. 15 at 9-10) Defendant responds that, regardless of such alternative, "practical economic grounds" (id. at 10) for Dr. Talley's prescription choice, the type and dosage of pain medication prescribed "is exactly the sort of information the ALJ must consider when determining how much weight to give an opinion." (Docket Entry No. 20 at 8)(citing 20 C.F.R. § 404.1529(c)(3)) Defendant proceeds to defend the ALJ's finding of plaintiff's poor credibility by reference to, *inter alia*, her ability to participate in an exercise

---

despite their assignment of scores reflecting, in a global sense, less dramatic difficulties. Both this court and the Sixth Circuit have decried the use of the global assessment of functioning scale and the superficial, macroscopic evaluation it entails, to disprove the evaluator's more detailed functional assessment. Smith v. Astrue, 565 F.Supp.2d 918, 924-25 (M.D. Tenn. 2008)(quoting Kennedy v. Astrue, 247 Fed.Appx. 761, 766 (6th Cir. Sept. 7, 2007)).

14

program and her prescription for only ibuprofen (id. at 11), as cited by the ALJ.

Respectfully, the undersigned finds that the ALJ was in fact misguided in construing the prescriptions for ibuprofen and exercise so heavily against plaintiff. While the ALJ did take into consideration plaintiff's normal x-rays and objective test results (Tr. 23), she did not place undue emphasis on such benign findings, as argued by plaintiff via her citation to Rogers, supra.[3] Rather, the ALJ's apparent understanding of the nature of the fibromyalgia diagnosis[4] is undermined by her failure to appreciate the generally appropriate medical treatment of the condition, as was implemented in plaintiff's case. According to internet publications of the Arthritis Foundation[5] and the National Institute of Arthritis and Musculoskeletal and Skin Diseases (an organization under the umbrella of the U.S.

---

[3]The undersigned must note, disapprovingly, that plaintiff utilizes large portions of Rogers as her argument concerning the nature of fibromyalgia, without quoting or otherwise attributing authorship to the panel in that case.

[4]The ALJ noted that, "in assessing the degree of th[is] impairment[], it is significant that her doctors identified no specific fibromyalgia trigger points..." (Tr. 22) As discussed in Rogers, 486 F.3d at 244, the appreciation of tenderness in an established number and distribution of trigger points is the primary diagnostic indicator of the disease. See also Swain v. Comm'r of Soc. Sec., 297 F.Supp.2d 986, 990 (N.D. Ohio 2003). However, the *diagnosis* of fibromyalgia is not questioned in the record, nor in the ALJ's decision. In analyzing the severity of plaintiff's resulting limitations, the ALJ draws a negative inference from "the lack of any trigger point injections," which she posits to "suggest more mild restrictions from her fibromyalgia." (Tr. 22) However, the ALJ cites no medical evidence or other authority to support her assertion that the absence of documented "fibromyalgia trigger points" and injections is significant to the analysis of the *severity* of the disease and/or its symptoms. Fibromyalgia pain is unquestionably not limited to the classic distribution of trigger points, but is "marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" Rogers, 486 F.3d at 244 n.3 (quoting Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)).
In any event, upon examination following her March 2007 syncopal episode, plaintiff was noted to "ha[ve] multiple trigger points that resulted in tenderness." (Tr. 261-62)

[5]http://www.arthritis.org/disease-center.php?disease_id=10&df=treatments

15

Department of Health and Human Services),[6] NSAIDs such as ibuprofen are often used for their analgesic effects in the treatment of fibromyalgia pain, in combination with, *inter alia*, tricyclic antidepressants such as Elavil.  Such antidepressants are typically given to fibromyalgia patients in doses lower than what is required for antidepressant effects, so as to improve the quality of sleep (which fibromyalgia often disrupts), relax painful muscles, and heighten the effects of endorphin, the body's natural painkiller.  Conversely, narcotic analgesics are <u>rarely</u> used in the treatment of chronic fibromyalgia pain.  As for the importance of aerobic exercise, the Arthritis Foundation article provides as follows:

> Studies have shown that exercising is essential for easing the symptoms of fibromyalgia.  Because of the pain, fatigue and weakness felt by people with fibromyalgia, most have become physically unfit.  Aerobic exercise, however, has analgesic and antidepressant effects, and it enhances your sense of well-being and control.  If you start in an exercise program slowly and build gradually, you will reap the benefits of exercise without becoming more fatigued and having more pain.[7]

Consistent with this medical approach to treating fibromyalgia, plaintiff has been encouraged to participate in an exercise program, and has been prescribed daily doses of 1200 milligrams of ibuprofen and 50 milligrams of Elavil, as well as 400 milligrams of Neurontin (Tr. 111-12, 280-81, 328, 423).  The ALJ erred by focusing on 600 milligrams of ibuprofen as plaintiff's only consistent pain prescription from Dr. Talley (Tr. 22), and reporting plaintiff's prescriptions for Neurontin and Elavil to be "for depression" (Tr. 20); she failed to appreciate that plaintiff took her 600-milligram ibuprofen pills twice per day, and

---

[6]http://www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp#e

[7]<u>Supra</u> n.5.

16

that the low dose of Elavil and the prescription for Neurontin were not in response to plaintiff's depression, but appear to have been prescribed for control of fibromyalgia (along with the muscle relaxant methocarbamol and an arthritis pain medication, colchicine) and neuropathic pain, respectively. (Tr. 111-12)

Speaking of plaintiff's neuropathic pain, although fibromyalgia is the focus of plaintiff's arguments, the ALJ appears to have likewise erroneously regarded the diagnosis of small fiber peripheral neuropathy. (Tr. 119, 177) As opposed to large fiber peripheral neuropathy, the small fiber variety does not typically manifest on electromyography ("EMG") or nerve conduction studies ("NCS").[8] Furthermore, on examination, there is a dramatic difference between reported pain symptoms and observable deficits; allodynia, a condition in which normally nonpainful stimuli evoke pain, may occur.[9] In this case, plaintiff was diagnosed with "small greater than large fiber, painful peripheral neuropathy with marked hyperpathia."[10] (Tr. 177) The December 2004 report of the consulting neurologist, Dr. Kountanis, revealed the finding that "even the slightest light touch to the skin elicits pain in the limbs" (Tr. 119). While the ALJ construed the negative results on EMG/NCS against plaintiff (Tr. 21, 22), and further found that Dr. Kountanis's report of plaintiff's exaggerated response to light touch suggested "some symptom magnification" (Tr. 21), it appears that these factors are entirely consistent with the clinical diagnosis of small fiber peripheral neuropathy.

---

[8]http://www.merck.com/mmpe/sec16/ch223/ch223h.html

[9]http://clinicaltrials.gov/ct2/show/NCT00787462

[10]Hyperpathia refers to "abnormally exaggerated subjective response to painful stimuli." Dorland's Illustrated Medical Dictionary 798 (28th ed. 1994).

17

In light of the foregoing, the undersigned concludes that this case must be returned to the agency for further development of the medical record, to include rehearing, and for further consideration of the combined effect of plaintiff's severe physical and mental impairments.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings, to include rehearing.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 8th day of April, 2009.

                                                  s/ John S. Bryant
                                                  JOHN S. BRYANT
                                                  UNITED STATES MAGISTRATE JUDGE